THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HECTOR HERNANDEZ, Defendant-Appellant.

First District (4th Division)   No. 1—98—1260

Opinion filed May 25, 2000.

Rita A. Fry, Public Defender, of Chicago (R.H.R. Silverhurst, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Kathleen Bom Lang, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HALL delivered the opinion of the court:

## I. BACKGROUND

Following a jury trial, Hector Hernandez (defendant) was convicted of three counts of first degree murder and sentenced to a term of life imprisonment. On appeal, defendant contends that the circuit court erred in: (1) denying his motion for a continuance; (2) admitting testimony into evidence concerning methods of drug trafficking and distribution; (3) allowing the use of a chart illustrating membership and rank within the Zapata drug distribution cartel; and (4) allowing prosecutorial questions on cross-examination regarding a tattoo of the devil on defendant's chest. For the reasons that follow, we affirm.

The following facts are relevant to this appeal. Esteban "El General" Zapata, Jose Santamaria, Rolando Lopez, and Mario Lopez (the Chicago faction) were members of a drug distribution network in Chicago known as the Zapata cartel. The Zapata cartel's headquarters were located in Falfurrias, Texas. Marcos Zapata was the leader of the Texas faction as well as the cousin of Esteban "El General" Zapata. Marcos Antonio Rodriguez was an assistant to Marcos Zapata. At defendant's trial, Mario Lopez testified that defendant was a distributor and an enforcer for the Texas faction. The trio of Marcos Zapata, Marcos Antonio Rodriguez, and defendant lived in Falfurrias, Texas.

Marcos Zapata and Marcos Antonio Rodriguez designed the drug distribution scheme for the Chicago faction. Allegedly, cocaine was shipped from Mexico to Elgin, Illinois. Refugio "Kuko" Deleon, who was based in Elgin, Illinois, received the shipment from Mexico. After the drugs were delivered to Refugio "Kuko" Deleon, Mario Lopez of the Chicago faction picked them up. The cocaine was then sold through local connections within the City of Chicago. Refugio "Kuko" Deleon was to be paid $18,000 for each kilogram (kilo) of cocaine tendered to the Chicago faction. Additionally, for each kilo of cocaine received by the Chicago faction, Marcos Zapata and Marcos Antonio Rodriguez received a $1,000 commission.

In November 1992, the Chicago faction began selling the cocaine to its connections for $20,000 per kilo. From December 1992 through

March 1993, the Chicago faction received approximately 300 kilos of cocaine. In March 1993, Refugio "Kuko" Deleon abruptly ended cocaine shipments to the Chicago faction. According to Refugio "Kuko" Deleon, Esteban "El General" Zapata owed $300,000 for cocaine that the Chicago faction had received. Marcos Zapata and Marcos Antonio Rodriguez telephoned Esteban Zapata and told him that he also owed Marcos Zapata and Marcos Antonio Rodriguez $200,000 in commissions.

On June 26, 1993, the Federal Bureau of Investigation (FBI) intercepted a telephone call between Marcos Zapata and defendant. Marcos Zapata and defendant discussed the large debt that was owed to the drug suppliers in Mexico. In that conversation, Marcos Zapata and defendant also talked about killing Esteban "El General" Zapata because of the money he owed. On the evening of July 12, 1993, at approximately 9 p.m., Esteban "El General" Zapata, Jose Santamaria and Rolando Lopez were shot to death in their Chicago apartment.

Leita Guerrero lived in the same apartment building as the murder victims. At trial, Guerrero testified that on the night of July 12, 1993, she heard "three thumps." According to Guerrero, the "thumps" sounded like "bodies falling." After she heard the "thumps," Guerrero saw three men running down a gangway adjacent to her apartment building. Defendant turned to face Guerrero as he ran past her window. The three men ran down the street toward a white van. Guerrero viewed a photo array and identified defendant as one of the men running from the murder scene on July 12, 1993.

Letitia Gomez Mercado lived next door to the apartment building where the shootings took place. At trial, Mercado testified that she was standing on the street in front of her apartment building when she heard gunshots. Immediately after hearing the shots, Mercado saw three men running through a gangway near the victims' apartment building. According to Mercado, the men ran past her in single file. Mercado positively identified defendant as one of the men she saw leaving the crime scene.

On August 7, 1993, defendant and Marcos Zapata were apprehended in Lincoln, Nebraska, on a charge unrelated to this appeal. An arresting officer looked through defendant's wallet. A piece of paper containing the name of one of the victims, Esteban Zapata, was found. In May 1994, defendant was extradited to Chicago.

On September 29, 1997, the jury returned a guilty verdict. On February 27, 1998, defendant was sentenced to a term of life imprisonment for the murders of Esteban Zapata, Jose Santamaria, and Rolando Lopez. This appeal followed.

# II. ANALYSIS

## A. Motion for Continuance

Defendant contends that the circuit court erred in denying his motion for a continuance. Specifically, defendant contends that he was denied an opportunity to investigate potentially exculpatory evidence. Defendant's contention is based on the statement of a confidential informant (CI).

■ The grant or denial of a motion for continuance is within the sound discretion of the circuit court judge. *People v. Collins*, 106 Ill. 2d 237, 478 N.E.2d 267 (1985); *People v. Edwards*, 167 Ill. App. 3d 324, 331-32, 521 N.E.2d 185 (1988). Whether a continuance is granted or denied depends upon the particular facts and circumstances surrounding the request. *People v. Davis*, 147 Ill. App. 3d 800, 802-03, 498 N.E.2d 633 (1986). A continuance for the purpose of allowing defense counsel further time to prepare is not erroneously denied unless the denial serves to prejudice the defendant in some way. *Edwards*, 167 Ill. App. 3d at 332. The party contesting the denial of his motion must establish that the denial resulted in prejudice at trial. *People v. Medina*, 239 Ill. App. 3d 871, 874, 607 N.E.2d 619 (1993).

The trial in this case began September 15, 1997. On September 5, 1997, the State informed defendant and the court that a CI may have important information regarding the murders of Esteban "El General" Zapata, Jose Santamaria, and Rolando Lopez. The court instructed the State to produce the CI so that defense counsel could have an opportunity to interview her.

The CI was interviewed three days later on September 8, 1997. The statement given by the CI was vague. The CI indicated that she "felt" members of the Chapa cartel, not the Zapata cartel, committed the murders. The CI heard neither any admission by any member of the Chapa cartel nor any conversation that directly linked the Chapa members to these homicides. When asked about the source or basis of her knowledge, the CI responded "don't ask me how I know they [the Chapa cartel] did this, I just know." Significantly, the CI was asked whether she knew if defendant had committed these murders. Her response was: "I don't know he [defendant] could have."

■ In light of the nebulous information provided by the CI, we conclude that the circuit court did not err in denying defendant's motion for a continuance. Defendant claims that the CI's statement is clearly exculpatory evidence. In our minds, it is not. The CI explicitly states that defendant *could have* participated in the murders. Such a statement surely cannot be considered exculpatory.

Finally, defendant is required to show how he was prejudiced by

the denial of his motion for a continuance. Defendant has failed to do so. Although defendant's motion for a continuance was denied, the circuit court stated that it would entertain another motion for a continuance at a later date, if the defense needed additional time to develop the CI's statement prior to presenting its case. Defendant did not move for another continuance; therefore, we can infer that the CI's statement was in fact immaterial. We find that defendant has failed to establish that he was prejudiced by the denial of his motion for a continuance. We also find that the circuit court did not abuse its discretion in denying defendant's motion for a continuance.

## B. Testimony of Bishop and Ramirez

■ Defendant contends that the circuit court erred in allowing into evidence Agent Keith Bishop's testimony concerning methods of drug trafficking and distribution. Defendant contends that Bishop's testimony was hearsay, irrelevant and prejudicial. Defendant also contends that the circuit court erred in allowing Agent Gabriel Ramirez to testify about the Zapata drug organization and its members. Defendant contends that Ramirez's testimony provided a motive for the crime and was inadmissible hearsay. The State contends that the testimonies of Bishop and Ramirez: (1) were not hearsay because their testimonies were based on personal knowledge obtained through their investigation of the criminal group; and (2) explained defendant's motive for shooting the victims.

Generally, expert witnesses are qualified if, because of their skill, training or experience, they are better able to form an accurate opinion concerning the matter at issue than is an average layperson. *People v. Jackson*, 145 Ill. App. 3d 626, 633, 495 N.E.2d 1207 (1986), citing *People v. Johnson*, 32 Ill. App. 3d 36, 46, 335 N.E.2d 144 (1975). Specialized formal training is not necessary. *Jackson*, 145 Ill. App. 3d at 633, citing *People v. Lang*, 106 Ill. App. 3d 808, 813, 436 N.E.2d 260 (1982). Experience may qualify an individual as an expert. *Jackson*, 145 Ill. App. 3d at 633, citing *Lang*, 106 Ill. App. 3d at 813. Experts are permitted to state their opinions if the information upon which they are basing their opinions is the type reasonably relied upon by experts in their field. *Jackson*, 145 Ill. App. 3d at 634, citing *Wilson v. Clark*, 84 Ill. 2d 186, 193-94, 417 N.E.2d 1322 (1981). Illinois courts recognize that a law enforcement officer's testimony regarding the activity of organized criminal groups is proper when: (1) the officer's testimony qualifies as an expert opinion; (2) the testimony is relevant; and (3) the prejudicial effect of the opinion does not outweigh its probative value. *People v. Langford*, 234 Ill. App. 3d 855, 858, 602 N.E.2d 9 (1992). A circuit court's determination that evidence is rele-

vant and admissible will not be reversed absent a clear abuse of discretion resulting in manifest prejudice to the defendant. *People v. Hayes*, 139 Ill. 2d 89, 130, 564 N.E.2d 803 (1990).

In the instant case, Bishop's and Ramirez's experience with drug-related criminal activity qualified them as expert witnesses. Bishop testified that his opinion was based on six years' experience as an agent for the Drug Enforcement Agency (DEA). Bishop testified that he began investigating the Zapata drug cartel in April 1992. Bishop also testified that his investigation of the Zapata drug cartel was an extensive operation which included wiretaps, surveillance, the use of Spanish translators and the execution of search warrants. Bishop testified that because of his thorough investigation of the cartel, in his opinion, he was very familiar with the hierarchy of the criminal group's members and its drug-related activity.

Ramirez testified that his opinion was based on six years' experience as an agent for the FBI. Ramirez also testified that, in November 1992, he began working on the investigation of the Zapata organization.[1] Ramirez testified that his investigation included monitoring wiretaps and executing search warrants. Ramirez also testified that he monitored approximately 30 to 40 telephone calls between defendant and Marcos Zapata. At trial, Ramirez identified the roles of certain members in the Zapata cartel. Ramirez testified that he assisted Chicago police officers in the murder investigation. Ramirez remained on this case until defendant was taken into custody.

Bishop and Ramirez based their opinions on many different sources including personal observation and informants. Both officers verified and investigated information learned from informants. We believe the testimonies of Bishop and Ramirez were based on information reasonably relied upon by DEA and FBI officials engaged in undercover investigations of drug organizations. We do not believe that average laypersons could have given a more accurate opinion regarding the membership and activities of the Zapata cartel. See *People v. Jackson*, 145 Ill. App. 3d 626, 634, 495 N.E.2d 1207 (1986). Nor do we believe that average laypersons would have had access to more accurate data than did Bishop and Ramirez. See *People v. Jackson*, 145 Ill. App. 3d 626, 634, 495 N.E.2d 1207 (1986). Additionally, we do not believe that the circuit court erred in finding that: (1) the testimonies of Bishop and Ramirez were relevant expert opinions; and (2) the probative value of the testimonies outweighed their prejudicial effect. Bishop and Ramirez's testimonies were relevant because

---

[1]Ramirez had been an agent with the FBI for 1$^{1}/_{2}$ years at the time he began working on the Zapata investigation.

they explained defendant's motive for shooting the victims. The record indicates that the victims were shot and killed because they owed money to the Texas faction of the Zapata cartel. Defendant was a distributor and the enforcer for the Texas faction. We find that the circuit court properly admitted the testimonies of Agents Bishop and Ramirez as expert testimony.

## C. Admissibility of Chart

■ Defendant contends that the circuit court erred in allowing the use of a chart which illustrated membership and rank within the Zapata drug cartel because the chart was based on Agent Bishop's testimony. The State contends that the circuit court did not abuse its discretion in admitting the chart into evidence because the chart was admissible as demonstrative evidence. The admission of demonstrative evidence is within the discretion of the circuit court. *People v. Singletary*, 73 Ill. App. 3d 239, 248, 391 N.E.2d 440 (1979).

In the instant case, the chart outlined membership and membership rank within the organization. At trial, Lopez and Bishop testified about the contents of the chart. Lopez, a member of the Chicago faction of the group, testified that defendant was a member of the Zapata cartel. Lopez also testified that defendant was ranked as "the enforcer" for the cartel. Lopez's testimony was properly admitted into evidence and was never at issue in this appeal. Bishop testified that, through his extensive investigation of the group, he knew defendant to be a member called "the enforcer." We have concluded that Bishop's testimony was properly admitted as expert testimony. Because the information contained in the chart was based on properly admitted testimonial evidence, the chart's admission at defendant's trial as demonstrative evidence was proper. We find that the circuit court did not err in admitting the chart into evidence.

## D. Cross-examination Concerning Tattoo

■ Defendant contends that prosecutorial questions on cross-examination about his chest tattoo of the devil were beyond the scope of direct examination. As a general rule, cross-examination is limited to the scope of the direct examination. *People v. Williams*, 66 Ill. 2d 478, 486-87, 363 N.E.2d 801 (1977). Circumstances may be developed on cross-examination that lie " 'within the knowledge of the witness which explain, qualify, discredit or destroy' " the direct testimony of the witness. *People v. Franklin*, 135 Ill. 2d 78, 97, 552 N.E.2d 743 (1990), quoting *Williams*, 66 Ill. 2d at 486. The extent of cross-examination rests within the sound discretion of the circuit court. *People v. Figueroa*, 308 Ill. App. 3d 93, 99, 719 N.E.2d 108 (1999), citing *People v. Burris*, 49 Ill. 2d 98, 104, 273 N.E.2d 605 (1971). A review-

ing court will not reverse the decision of the circuit court, to permit a certain line of questioning, unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant. *People v. Kliner*, 185 Ill. 2d 81, 705 N.E.2d 850 (1998).

In the instant case, eyewitnesses Guerrero and Mercado testified that defendant was one of three men they saw running from the scene of the crime. Guerrero testified that the men ran past her in single file, and defendant was the third man in line. Both eyewitnesses also testified that defendant was wearing a short-sleeved shirt on the night of the murders. Defendant argues that it is uncontested that he has prominent tattoos covering both of his arms. Neither Guerrero nor Mercado, in describing defendant, mentioned that defendant had various tattoos on his arms. Defendant argues that if he were the "third man," the eyewitnesses would have noticed his tattooed arms.

At defendant's trial, defense witnesses Terry Syler, Gloria Garza and Mrs. Hernandez testified. On direct examination, Terry Syler testified that defendant had distinct tattoos on his arms: a peace sign, a lady, and an eight ball. On cross-examination, Syler was asked: "Are you aware he [defendant] has a tattoo of the devil on his chest?" Syler replied "No." On direct examination, Gloria Garza was asked a series of questions about defendant's tattoos and was asked to identify several pictures of those tattoos. On cross-examination, Garza was asked: "Did you see the tattoo of the devil on his [defendant's] chest?" Garza replied "No." Finally, Mrs. Hernandez, defendant's wife, was asked on direct examination to identify defendant's tattoos.

During direct examination, defense witnesses were questioned about tattoos on defendant's arms. These witnesses were only questioned about those tattoos that would have been visible to the eyewitnesses on the night of the shootings. We believe that the only relevant tattoos were those that could have been seen by Guerrero and Mercado. Because defendant was wearing a shirt at the time of the murders, a chest tattoo would not have been apparent to the eyewitnesses. However, because defendant was wearing a short-sleeved shirt on that night, any tattoos on his arms were visible and could have been used by the eyewitnesses to identify defendant. We believe that cross-examination concerning defendant's tattoos should have been limited to those tattoos that were not covered and therefore potentially identifiable by the eyewitnesses. Questions on cross-examination concerning a tattoo on defendant's chest, which was covered on that night, were beyond the scope of direct examination and should not have been permitted. Notwithstanding, we find that the error is harmless.

Defendant contends, for the first time on appeal, that the

prosecutor's questions about his tattoo of the devil served as an attack on his character. When a party specifically objects to certain evidence, all grounds not specified are waived. *People v. Eyler*, 133 Ill. 2d 173, 549 N.E.2d 268 (1989); *People v. Nichols*, 235 Ill. App. 3d 499, 513, 601 N.E.2d 1217 (1992). Defendant objected only on the ground that the questions were beyond the scope of direct examination. Defendant cannot now amend his basis for the original objection to include prejudice. Thus, this matter is waived.

In sum, our review of the record reveals no errors sufficient to require reversal. Any alleged errors or deficiencies which may have occurred were harmless. We believe this to be true in light of the fact that the evidence of defendant's guilt is overwhelming. We note that: (1) there were two witnesses who identified defendant as one of the three men who fled the crime scene; (2) the name of one of the victims was found in defendant's wallet; (3) law enforcement officers intercepted and taped a telephone conversation between Marcos Zapata and defendant in which they talked about killing Esteban Zapata because he owed them money; and (4) a member of the Zapata cartel, Mario Lopez, testified that defendant was "the enforcer" for the drug organization.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HOFFMAN, P.J., and SOUTH, J., concur.